IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PENNSYLVANIA INSTITUTIONAL          :
LAW PROJECT, ABOLITIONIST           :
LAW CENTER, AMISTAD LAW             :
PROJECT, AND AMERICAN              :
CIVIL LIBERTIES UNION               :
OF PENNSYLVANIA,                    :
                                    :     No. 1:18-cv-2100
            Plaintiff,              :
                                    :
      v.                            :
                                    :
JOHN E. WETZEL,                     :
Secretary of Department of Corrections, :
SHIRLEY MOORE SMEAL, Executive      :
Deputy Secretary of Department of   :
Corrections, and TABB BICKELL,      :
Executive Deputy Secretary for      :
Institutional Operations,           :
                                    :
            Defendants.             :

---

# BRIEF IN SUPPORT OF
# PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

I.  PROCEDURAL HISTORY ...................................................................2

II.  FACTUAL BACKGROUND ..............................................................2

  A.  DOC Policies Relating to Legal Mail ...........................................2

  B.  The Impact of the New Legal Mail Policy on Plaintiffs
     and Their Clients ...........................................................................5

III.  STATEMENT OF QUESTIONS INVOLVED ...................................7

  A.  Have Plaintiffs Established a Reasonable Likelihood of Success on
     the Merits of Their Claims that the DOC's New Legal Mail Policy
     Violates Plaintiffs' and Their Clients' First Amendment Rights? .........7

  B.  Are Plaintiffs Likely to Suffer Irreparable Harm Without an
     Injunction? ...................................................................................7

  C.  Do Plaintiffs Satisfy the Other Conditions for Issuance of a
     Preliminary Injunction? ...............................................................7

IV.  ARGUMENT ...................................................................................8

  A.  Plaintiffs Have a Reasonable Likelihood of Success on the Merits of
     Their First Amendment Claim Because the DOC's New Legal Mail
     Policy Violates Their Constitutional Right to Free Speech ...................8

    1.  Incarcerated Individuals and Their Attorneys Have a First
       Amendment Right of Free Speech in Their Privileged
       Communications ....................................................................9

    2.  By Copying and Maintaining Privileged Legal Correspondence
       Outside the Presence of Its Recipients, the New Legal Mail Policy
       Infringes Upon the First Amendment Rights of Incarcerated
       Individuals and Their Attorneys ...........................................12

    3.  The DOC's New Legal Mail Policy Does Not Meet the
       Requirements of *Turner v. Safley* and Is Unconstitutional ...............18

      a.  There Is No Valid, Rational Connection Between the New
        Legal Mail Policy and the DOC's Stated Interest ...............19

      b.  There Are No Reasonable Alternative Means for Incarcerated
        Individuals and Their Attorneys to Exercise Their First
        Amendment Right to Engage in Confidential Communications .......23

      **c.  Allowing Attorneys to Communicate Confidentially with Their Incarcerated Clients Would Not Have an Adverse Impact on the DOC's Stated Interests** ........................................................................26

      **d.  Available Alternatives Exist that Would Be Less Intrusive to Plaintiffs' Right to Engage in Confidential Attorney-Client Communications** ....................................................................................27

  **B.  The New Legal Mail Policy Causes Irreparable Injury to Plaintiffs' First Amendment Rights** ............................................................................29

  **C.  Defendants Would Not Be Harmed by the Issuance of an Injunction and the Public Interest Supports an Injunction Here** ....................................31

**V.  CONCLUSION** ..............................................................................................34

PHDATA 6628401_2

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Abu-Jamal v. Price*,
154 F.3d 128 (3d Cir. 1998) ................................................................29

*Al-Amin v. Smith*,
511 F.3d 1317 (11th Cir. 2008) ................................................... 14, 31

*American Civil Liberties Union Fund of Michigan v. Livingston County*,
23 F. Supp. 3d 834 (E.D. Mich. 2014) ................................................34

*Beattie v. Line Mountain Sch. Dist.*,
992 F. Supp. 2d 384 (M.D. Pa. 2014) ................................................29

*Bieregu v. Reno*,
59 F.3d 1445 (3d Cir. 1995) ........................... 9, 10, 11, 12, 13, 16, 20, 24, 26, 27

*Bell v. Wolfish*,
441 U.S. 520 (1979) ...........................................................................12

*Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*,
908 F.2d 951 (Fed. Cir. 1990) ..............................................................8

*Council of Alternative Political Parties v. Hooks*,
121 F.3d 876 (3d Cir. 1997) ......................................................... 29, 32

*DeHart v. Horn*,
227 F.3d 47 (3d Cir. 2000) ........................................................ 18, 19, 23

*Denius v. Dunlap*,
209 F.3d 944 (7th Cir. 2000) ..............................................................33

*Edwards Lifesciences AG v. CoreValve, Inc.*, C.A. No. 08-91 (GMS),
2014 WL 1493187 (Apr. 15, 2014) ......................................................8

*Fontroy v. Beard*,
559 F.3d 173 (3d Cir. 2009) ................................................................20

*Highmark v. UPMC Health Plan, Inc.*,
276 F.3d 160 (3d Cir. 2001) ................................................................8

i

*Jones v. Brown*,
    461 F.3d 353 (3d Cir. 2006), ................................................. 13, 16, 19, 20, 21, 31

*Jones v. North Carolina Prisoners' Labor Union, Inc.*,
    433 U.S. 119 (1977) ....................................................................... 12, 19

*Klitzman, Klitzman and Gallagher v. Krut*,
    744 F.2d 955 (3d Cir. 1984) ..................................................................33

*Lavado v. Keohane*,
    992 F.2d 601 (6th Cir.1993) ..................................................................10

*Lewis v. Casey*,
    518 U.S. 343 (1996) ..........................................................................9

*Martin v. Lauer*,
    686 F.2d 24 (D.C. Cir. 1982)..................................................................33

*McIntyre v. Ohio Elections Comm.*,
    514 U.S. 334 (1994) ..........................................................................33

*Musser's Inc. v. United States.*,
    No. 10-4355, 2011 WL 4467784 (E.D. Pa. Sept. 26, 2011) ................................30

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ..........................................................................34

*Nordstrom v. Ryan*,
    956 F.3d 1265 (9th Cir. 2017) ..............................................................14

*Overton v. Bazzetta*,
    539 U.S. 126 (2003) ..........................................................................26

*Pell v. Procunier*,
    417 U.S. 817 (1974) ..........................................................................12

*Procunier v. Martinez*,
    416 U.S. 396 (1974) ..................................................................... 11, 12

*Ramos v. Lamm*,
    639 F.2d 559 (10th Cir.1980) ..............................................................11

PHDATA 6628401_2

*Shimer v. Washington*,
    100 F.3d 506 (7th Cir. 1996) ...............................................................19

*Taylor v. Sterrett*,
    532 F.2d 462 (5th Cir. 1976) ...................................................... 10, 14

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
    309 F.3d 144 (3d Cir. 2002) ..............................................................8, 32

*Thornburgh v. Abbott*,
    490 U.S. 401 (1989) ................................................................... 11, 12

*Turner v. Safley,*
    482 U.S. 78 (1987) ................................... 9, 10, 12, 18, 19, 20, 23, 26, 28, 32, 34

*U.S. v. Burleson*,
    255 U.S. 407 (1921) ...........................................................................9

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981) ...........................................................................9

*Williams v. Bitner*,
    359 F. Supp. 2d 370 (M.D. Pa. 2005) .................................................28

*Wolf v. Ashcroft*,
    297 F.3d 305 (3d Cir. 2002) .............................................................19

*Wolff v. McDonnell*,
    418 U.S. 539 (1974) ...................................................... 10, 12, 13, 16

**OTHER AUTHORITIES**

Gregory C. Sisk, *Legal Ethics and the Practice of Law 4-6.1*, LEGAL ETHICS, PROF.
    RESP., & THE LEGAL PROF., 2018 ......................................................32

**RULES**

Pennsylvania Rules of Prof'l Conduct, r. 1.4, 1.6(d) (2016)........................ 9, 25, 32

**REGULATIONS**

28 C.F.R. §540.18 (1994) ......................................................................27

PHDATA 6628401_2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PENNSYLVANIA INSTITUTIONAL          :
LAW PROJECT, ABOLITIONIST           :
LAW CENTER, AMISTAD LAW             :
PROJECT, AND AMERICAN               :
CIVIL LIBERTIES UNION               :
OF PENNSYLVANIA,                    :
                                    :        No. 1:18-cv-2100
          Plaintiff,                :
                                    :
     v.                             :
                                    :
JOHN E. WETZEL,                     :
Secretary of Department of Corrections,  :
SHIRLEY MOORE SMEAL, Executive      :
Deputy Secretary of Department of   :
Corrections, and TABB BICKELL,      :
Executive Deputy Secretary for      :
Institutional Operations,           :
                                    :
          Defendants.               :

## BRIEF IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Incarcerated individuals and their attorneys have a First Amendment free speech right to send and receive legal mail.[1] Nonetheless, the Defendants have advanced a new legal mail policy that infringes upon this constitutional right, and

---

[1]     "Legal mail" consists of mail between incarcerated individuals and their attorneys or the court.

the Plaintiffs[2] have been and continue to be irreparably harmed as a result of this new policy. An injunction is necessary to stop enforcement of the new policy, and to protect the confidentiality of their attorney-client communications and preserve the attorney-client privilege.

## I.      PROCEDURAL HISTORY

Plaintiffs filed their Complaint on October 30, 2018. Plaintiffs filed their Motion for Preliminary Injunction on October 30, 2018. This Brief is filed in support of that Motion.

## II.     FACTUAL BACKGROUND

### A.      DOC Policies Relating to Legal Mail

Prior to August 29, 2018, the Pennsylvania Department of Corrections' ("DOC") policy regarding legal mail was as follows:

> B.    Incoming Privileged Correspondence
>
> 1.    Incoming privileged correspondence will be opened and inspected for contraband in the presence of the inmate to whom it is addressed . . .
>
> 2.    If upon opening the envelope in the presence of the inmate, the staff member, without reading the contents, notices that the envelope contains

---

[2]      "Plaintiffs" includes the Pennsylvania Institutional Law Project, Abolitionist Law Center, Amistad Law Project and the American Civil Liberties Union of Pennsylvania, Plaintiffs in the matter docketed at No. 1:18-cv-2100 (the "Organizational Plaintiffs") and Davon Hayes, Plaintiff in the matter docketed at No. 1:18-cv-2099.

absolutely no legal material (e.g. contains only a publication readily available to the public with no notations from counsel), the staff member shall not issue the contents to the inmate . . .

3.   Incoming privileged correspondence may be read upon the written approval of the Secretary/designee when there is reason to believe that there is a threat to facility security or criminal activity.
. . .

Verified Complaints, Exhibit 1 thereto, pages 2-4. To identify mail as privileged correspondence, the DOC required attorneys to apply for a control number, and include that number on the envelope for all legal mail. "The control number is a confidential number that will not be provided to the inmate. To keep this number confidential, the mailroom staff will cross-out the number with a permanent marker or other method prior to the envelope being delivered to the inmate." Pa. Dep't of Corrections, *Control Number*, https://www.cor.pa.gov/How%20Do%20I/Pages/Control-Number.aspx (last visited October 31, 2018).

On August 29, 2018, the DOC instituted a statewide lockdown due to "reports of multiple staff members being sickened by unknown substances over the past few weeks." Pa. Dep't of Corrections, *FAQ – New Procedures*, https://www.cor.pa.gov/Initiatives/Pages/FAQ-New-Procedures.aspx (last visited October 31, 2018). The DOC acknowledged seven possible "points of entry" for

PHDATA 6628401_2

these unknown substances: mail, legal mail, visits, staff, books/publications, drones and prisoners returning after having been released. According to the DOC's website: "It's speculated that the majority of contraband enters the facilities through the mail." *Id.*

The DOC is not aware of any instance of these substances being introduced into DOC facilities through bona fide legal mail. The DOC has identified certain circumstances when attorney control numbers have been learned by others and used to disguise non-legal mail as legal mail. Plaintiffs are aware of instances where staff did not completely cross out the attorney control number or failed to remove the control number label.

Notwithstanding the lack of any connection between the "unknown substances" and bona fide legal mail, the DOC implemented a new policy ("New Legal Mail Policy"), under which staff will confiscate incoming legal mail, inspect it for contraband, and make a copy of the legal mail for the incarcerated individual while retaining the original, opened legal mail outside the presence of the recipient in a "secure receptacle" for at least 45 days. Verified Complaints, Exhibit 4, page 1-12. Each DOC facility is responsible for procuring the services of a vendor for the safekeeping and confidential destruction of incoming legal mail. *Id.* As of this date, not every DOC Facility has identified such a vendor. Hayes Compl., ¶ 51.

**B.** **The Impact of the New Legal Mail Policy on Plaintiffs and Their Clients**

Organizational Plaintiffs represent individuals incarcerated in various DOC facilities. In order to communicate with their clients, Organizational Plaintiffs regularly send confidential material through the mail. Mr. Hayes likewise uses the mail to communicate with his attorneys. The information shared in these communications can include letters or memoranda on legal strategy, draft pleadings or discovery responses, information learned from discovery or investigation relating to the underlying matter, settlement discussions, analysis of court decisions, or answers to questions posed by clients to attorneys. All of this information is privileged and confidential, and in many cases, the adverse parties in those underlying matters are Defendants or DOC staff.

Organizational Plaintiffs have been advised by legal ethics experts that, in light of the New Legal Mail Policy, they should discontinue the use of mail for privileged communications with clients in DOC prisons. Instead, Organizational Plaintiffs and the attorneys for Mr. Hayes have been forced to travel throughout the Commonwealth to meet with their clients personally each time they need to discuss anything with them. The Organizational Plaintiffs are non-profit organizations that do not have the staff and resources to continue in-person visits for all such communications, and counsel representing Mr. Hayes in his habeas petition are

PHDATA 6628401_2

federal public defenders with similarly limited resources.  The attorneys often must travel hours and incur substantial additional costs for in-person visits, which necessarily limits what these attorneys can do for these and other clients.

DOC facilities prohibit attorneys from hand-delivering documents to their clients during in-person visits unless the attorney receives special advance permission from the prison, and some facilities prohibit the practice entirely. Although attorneys may review documents with clients during in-person visits, those visits often take place in public visiting rooms if no private rooms are available, and such sharing is impractical when an attorney needs a client to review a lengthy document. And for clients in higher security settings, the only alternative to mail is to place documents up to a glass for the client to read page-by-page—a procedure that is unworkable for documents more than a few pages in length.

In addition, DOC prisons have limited visiting hours. Visiting hours at most prisons are from 8:30 am to 3:30 p.m. and visits are only permitted on weekends and 2-3 business days per week. To meet with a client or potential client, attorneys must first be placed on the individual's visitation list, a process that must be initiated by the incarcerated individual and can often take a week or more.

The only other alternative to communication by mail is unmonitored phone calls. These also are severely restricted. To set up unmonitored phone calls with an attorney, individuals in DOC prisons must first request that the attorney be placed

on their phone list. It often takes a week or more for such requests to be processed. Once the prison places the attorney on an individual's phone list, the individual can make calls to the attorney from the prison, but the attorney must make a special request to the prison to set up a call with his or her client. Prison employees often deny these requests and have also refused to transmit attorney requests to their clients to call them.

Given the serious lack of viable alternatives to mail, the inability to communicate confidentially by mail has caused numerous instances of delayed proceedings and motions for stay or for extensions of time, and has substantially impeded the attorneys' ability to zealously and competently represent their clients.

## III.   STATEMENT OF QUESTIONS INVOLVED

### A.   Have Plaintiffs Established a Reasonable Likelihood of Success on the Merits of Their Claims that the DOC's New Legal Mail Policy Violates Plaintiffs' and Their Clients' First Amendment rights?

**Suggested answer: Yes**

### B.   Are Plaintiffs Likely to Suffer Irreparable Harm Without an Injunction?

**Suggested answer: Yes**

### C.   Do Plaintiffs Satisfy the Other Conditions for Issuance of a Preliminary Injunction?

**Suggested answer: Yes**

PHDATA 6628401_2

## IV.   ARGUMENT

To obtain preliminary injunctive relief, Plaintiffs must satisfy four well-settled conditions: (1) a "reasonable likelihood" of success on the merits; (2) a likelihood of "irreparable harm" absent the relief sought; (3) the harm to Plaintiff by denying preliminary injunctive relief outweighs the harm to the defendants by granting such relief; and (4) preliminary injunctive relief would serve the public interest. *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002.   No one factor will determine whether the court will issue a preliminary injunction. Rather, "[t]he court must balance all four factors, but the court may grant the preliminary injunction where 'the weakness of the showing regarding one factor is overborne by the strength of the others.'" *Edwards Lifesciences AG v. CoreValve, Inc.*, C.A. No. 08-91 (GMS), 2014 WL 1493187, at *3 (Apr. 15, 2014) (quoting *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990)).

### A.   <u>Plaintiffs Have a Reasonable Likelihood of Success on the Merits of Their First Amendment Claim Because the DOC's New Legal Mail Policy Violates Their Constitutional Right to Free Speech</u>

On a motion for a preliminary injunction, "the plaintiff need only prove a *prima facie* case, not a certainty that he or she will win." *Highmark v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001).   Here, the New Legal Mail Policy infringes upon the First Amendment right to free speech of both

incarcerated individuals and their attorneys because it does not ensure, as it must, that privileged legal mail remains confidential.[3] Rather, it results in opened legal mail being confiscated and retained outside the presence of its recipient for 45 days, and provides numerous opportunities for that mail to be skimmed or read. This infringement on Plaintiffs' rights does not have a valid, rational connection to the DOC's stated reason for the policy, and thus fails the test under *Turner v. Safley*, 482 U.S. 78, 84 (1987).

1.    **Incarcerated Individuals and Their Attorneys Have a First Amendment Right of Free Speech in Their Privileged Communications**

"The United States may give up the Post Office when it sees fit, but while it carries it on the use of the mail is almost as much a part of free speech as the right to use our tongues." *Bieregu v. Reno*, 59 F.3d 1445, 1451 (3d Cir. 1995) (quoting *U.S. v. Burleson*, 255 U.S. 407, 437 (1921) (Holmes, J., dissenting)), *overruled on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996). The U.S. Court of Appeals

---

[3]    The attorney-client privilege protects communications between attorney and client, and is the oldest legal privilege relating to confidential communications. *See Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981). The Supreme Court has recognized the absolute importance of this privilege as it "promote[s] broader public interests in the observance of law and administration of justice" by encouraging candid discussions between client and attorney. *Id.* Moreover, attorneys are ethically required to maintain the confidentiality of their communications with their clients. Pennsylvania Rules of Prof'l Conduct, r. 1.6 ("A lawyer shall make reasonable efforts to prevent the inadvertent or unauthorized disclosure of, or unauthorized access to, information relating to the representation of a client.").

for the Third Circuit has confirmed that this free speech right does not stop at the prison gate.  *See Bieregu*, 59 F.3d at 1450, 1452 ("Clearly then, prisoners do not forfeit their First Amendment rights to use of the mails.")*; see also Turner v. Safley*, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution"); *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974) ("There is no iron curtain drawn between the Constitution and the prisons of this country").

The First Amendment right of free speech covers, in particular, privileged communications between incarcerated individuals and their attorneys. "[P]risoners have a vital need to communicate effectively with [their attorneys]…Since the prisoner's means of communicating with these parties are restricted sharply by the fact of incarceration, the essential role of postal communication cannot be ignored." *Taylor v. Sterrett*, 532 F.2d 462, 475 (5th Cir. 1976).  The free speech interest in one's legal mail is "uninhibited communication with attorneys." *Id.* Indeed, "[o]f all communications, attorney mail is the most sacrosant." *Bieregu,* 59 F.3d at 1456.  For this reason, in the context of mail between incarcerated individuals and their attorneys, the Courts of Appeals have held that opening such mail outside the presence of the incarcerated individual violates their First Amendment rights. *Id.* at 1452*.  See also Lavado v. Keohane*, 992 F.2d 601, 609-10 (6th Cir.1993 ("opening/reading" incoming court mail outside prisoner's

presence in arbitrary or capricious fashion violates First Amendment); *Ramos v. Lamm*, 639 F.2d 559, 582 (10th Cir.1980) (opening outgoing court and attorney mail outside presence of prisoner violates the First Amendment), *cert. denied*, 450 U.S. 1041 (1981). The Third Circuit has cautioned that "[s]uch a practice chills protected expression and may inhibit the inmate's ability to speak, protest, and complain openly, directly, and without reservation with the court." *Bieregu,* 59 F.3d at 1452.

Both incarcerated individuals and those with whom they correspond, including their attorneys, have a First Amendment right to confidential legal communications. "[M]ail censorship implicates more than the [First Amendment] rights of prisoners." *Procunier v. Martinez*, 416 U.S. 396, 408 (1974, *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). "Access is essential to lawyers and legal assistants representing prisoner clients, to journalists seeking information about prison conditions, and to families and friends of prisoners who seek to sustain relationships with [prisoners]." *Thornburgh*, 490 U.S. at 407 (internal citations omitted).  The standards by which policies should be judged are the same, regardless of whether the rights of incarcerated individuals or the rights

of outsiders are at issue. *Id.* at 410;[4] *see also Bieregu*, 59 F.3d at 1452 ("In the years after *Procunier* and *Wolff*, however, the Court abandoned the distinction between the free speech rights of inmates and their correspondents on the outside").

It cannot reasonably be disputed that incarcerated individuals and their attorneys each have a First Amendment right to privileged communications.

### 2. By Copying and Maintaining Privileged Legal Correspondence Outside the Presence of Its Recipients, the New Legal Mail Policy Infringes upon the First Amendment Rights of Incarcerated Individuals and Their Attorneys

The Third Circuit has steadfastly maintained that the only way to assure the confidentiality of legal mail is to require that prisoners be present when it is

---

[4]      "We do not think it sufficient to focus, as respondents urge, on the identity of the individuals whose rights allegedly have been infringed. Although the Court took special note in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974, of the fact that the rights of nonprisoners were at issue, and stated a rule in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), for circumstances in which "a prison regulation impinges on *inmates'* constitutional rights," *id.* at 89, 107 S.Ct., at 2261 *(emphasis added),* any attempt to forge separate standards for cases implicating the rights of outsiders is out of step with the intervening decisions in *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)*; Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977)*;* and *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). These three cases, on which the Court expressly relied in *Turner* when it announced the reasonableness standard for "inmates' constitutional rights" cases, all involved regulations that affected rights of prisoners and outsiders." *Thornburgh v. Abbott*, 490 U.S. 401, 410 n. 9 (1989).

opened and at all times thereafter. Without that assurance, correspondence between prisoners and their attorneys will be unconstitutionally restrained:

> [W]e are satisfied that a pattern and practice of opening properly marked incoming court mail outside an inmate's presence infringes communication protected by the right to free speech. Such a practice chills protected expression and may inhibit the inmate's ability to speak, protest, and complain openly, directly, and without reservation with the court.

*Bieregu*, 59 F.3d at 1452. The court further noted that "the only way to ensure that mail is not read when opened . . . is to require that it be done in the presence of the inmate to whom it is addressed." *Id.* at 1456 (quoting *Wolff*, 418 U.S. at 576-77).

More recently, in *Jones v. Brown*, 461 F.3d 353 (3d Cir. 2006), the Third Circuit reaffirmed that legal mail cannot be opened outside of an inmate's presence. In doing so, the court made clear that protecting the confidentiality of legal mail is paramount in preserving the free speech rights of incarcerated individuals: "[O]pening legal mail outside the presence of the addressee inmate interferes with protected communications, strips those protected communications of their confidentiality, and accordingly impinges upon the inmate's right to freedom of speech." *Id.* at 359. The court came to this conclusion even though the policy specifically forbade the reading of legal mail. *Id.* at 357. Indeed, the court noted that "[t]he practice [of opening legal mail outside of an inmate's presence] deprives the expression of confidentiality and chills the inmates' protected

expression **regardless of the state's good-faith protestations that it does not, and will not, read the content of the communications**." *Id.* at 359 (emphasis added).

Courts of Appeals in other circuits agree that opening legal mail outside of a prisoner's presence is an infringement on that person's First Amendment free speech rights, even where the legal mail is not read. *See, e.g., Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir. 2008) (holding that defendant's pattern and practice of opening (but not reading) plaintiff's attorney mail outside his presence infringed his right to free speech); *Taylor v. Sterrett*, 532 F.2d 462, 475 (5th Cir. 1976 (holding that legal mail can only be opened in presence of incarcerated individual, and that inspection should be limited to locating contraband and cannot entail reading enclosed correspondence). Further, even when the incarcerated individual is present, any policy that allows skimming legal mail violates these constitutional rights. For instance, in *Nordstrom v. Ryan*, 956 F.3d 1265 (9th Cir. 2017), the Ninth Circuit rejected a policy that permitted skimming, but not reading, of legal mail in the prisoner's presence. The court held that an inspection of legal mail should not extend beyond a "cursory visual inspection" and clarified that a policy that requires prison officials to "verify that the letter's contents qualify as legal mail" infringes on First Amendment rights. *Id.* at 1272.

Under the old DOC policy, and in similar policies throughout the country, prison officials would open the mail in the presence of the incarcerated individual,

check for contraband without reading the contents of that mail, and then hand the mail over to the individual. This procedure assured that at no time would legal mail, once opened, be outside of the incarcerated individual's vision, and thus there would be no opportunity for others to read the privileged communication. Although the New Legal Mail Policy provides for the initial opening of the mail in the presence of the prisoner, it goes well beyond the old policy and other policies that have been held constitutional. Under the new policy, opened legal mail is confiscated and stored outside the presence of the inmate for 45 days or more. This warehousing of legal mail once it has been opened poses a substantial risk for disclosure. The new policy is thus more akin to those policies—that have been declared unconstitutional—allowing for legal mail to be opened, but not read, outside the presence of its recipient. Undersigned counsel is not aware of any other state implementing a policy similar to the New Legal Mail Policy.

First, the act of copying itself creates an opportunity for disclosure. Correctional officers will have to remove binding or staples, ensure copies are legible and clear, and for larger documents, may have to feed pages into the copier in stages. There are numerous opportunities during this process for an officer to skim, inadvertently or intentionally, the contents of those communications. It is also possible that a correctional officer could make more than one copy of the document, but hand over only one copy to its recipient, as prisoners have reported

they are unable to view the copying process. Moreover, when the copy provided to the prisoner is not sufficiently legible and clear, that itself interferes with attorney-client communications and thus infringes on First Amendment rights.

Second, the original mail is stored outside the prisoner's presence for 45 days or more. As the Third Circuit has stated repeatedly, the DOC's promise not to read the communications is plainly insufficient to protect the constitutional rights of prisoners and those with whom they correspond. *Jones*, 461 F.3d at 359 ("[t]he practice [of opening legal mail outside an inmate's presence] deprives the expression of confidentiality and chills the inmates' protected expression ***regardless of the state's good-faith protestations that it does not, and will not, read the content of the communications***." (emphasis added)); *Bieregu*, at 1456 ("the only way to ensure that mail is not read when opened . . . is to require that it be done in the presence of the inmate to whom it is addressed (quoting *Wolff*, 418 U.S. at 576-77)). Yet the new policy requires facilities to retain legal correspondence outside the presence of the incarcerated individual for an extended period of time.

Further, the Policy does not address how electronic copies of scanned documents will be stored or destroyed.[5] Plaintiffs are aware that officers at one facility were unable to answer questions from incarcerated individuals as to how digital scans were being handled. The potential existence of electronic copies of confidential legal mail, without information as to how long they will be stored, who will have access, and how those files will be destroyed, unquestionably chills protected speech and obliterates the confidentiality of that correspondence.

Because the new policy involves the confiscation and retention of opened legal mail outside the presence of the incarcerated individual, and because it allows numerous opportunities for the content of that mail to be read, either inadvertently or intentionally, the policy infringes upon the First Amendment rights of incarcerated individuals and their attorneys.

---

[5]   Unless the copiers being used by the DOC were created before 2002, they likely possess a hard drive that stores digital copies of every document scanned or copied by that machine that can later be accessed. *See e.g.,* A. Keteyian, *Digital Photocopiers Loaded With Secrets, available at* https://www.cbsnews.com/news/digital-photocopiers-loaded-with-secrets/ (last accessed October 31, 2018) (describing the thousands of pages of documents obtained from a few copier harddrives); *Digital Copier Data Security, A Guide for Businesses*, https://www.ftc.gov/tips-advice/business-center/guidance/digital-copier-data-security-guide-businesses (last accessed October 31, 2018) (detailing ways companies can protect data on copiers, including ensuring the data is regularly overwritten).

### 3. The DOC's New Legal Mail Policy Does Not Meet the Requirements of *Turner v. Safley* and Is Unconstitutional

Even where a prison policy infringes upon constitutional rights, it may still be upheld if it is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. 78, 89 (1987). "[W]hile this standard of review requires a court to respect the security, rehabilitation, and administrative concerns underlying a prison regulation…it also requires a court to give weight, in assessing the overall reasonableness of regulations, to the inmate's interest in engaging in constitutionally protected activity." *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000). The U. S. Supreme Court identified four factors that are relevant in making this determination: (1) whether there is "a valid, rational connection" between the regulation and the prison's stated interest; (2) whether there are "alternative means of exercising the right at issue"; (3) whether accommodating the right asserted by the incarcerated individual would have an adverse effect on the institution, including other incarcerated individuals, corrections officers, and government resources; and (4) whether alternatives are available to prison officials to meet their legitimate interests. *Turner,* 482 U.S. at 89-91.

"*Turner* does not call for placing each factor in one of two columns and tallying a numerical result. The objective is to determine whether the regulation is reasonable given the prison administrators' penological concerns and the inmate's interest in engaging in the constitutionally protected activity." *DeHart*, 227 F.3d at

59.     Although a certain amount of "deference to the decisions of prison administrators…and recognition [of] the peculiar and restrictive circumstances of the penal confinement" is appropriate, *Jones v. North Carolina Prisoners' Labor Union, Inc*., 433 U.S. 119, 125 (1977), "[t]he prison administration must proffer some evidence to support its restriction [on] constitutional rights" and "cannot avoid court scrutiny by reflexive, rote assertions," *Shimer v. Washington*, 100 F.3d 506, 509-10 (7th Cir. 1996).

This policy fails all factors of the *Turner* test and is thus an unreasonable constraint on Plaintiffs' First Amendment rights.

> a.     There Is No Valid, Rational Connection Between the New Legal Mail Policy and the DOC's Stated Interest

In order to meet the requirements of the first *Turner* factor, prison officials must "put forward the legitimate governmental interest alleged to justify the regulation and demonstrate that the policy drafters could rationally have seen a connection between the policy and [that interest]." *Jones*, 461 F.3d at 360-61.  The burden is on prison officials to present evidence of the alleged connection. *Wolf v. Ashcroft*, 297 F.3d 305, 308-09 (3d Cir. 2002).  When neither common sense nor evidence demonstrates "a reasonable causal nexus" between the regulation and the stated interest, the plaintiff may be entitled to injunctive relief. *Jones*, 461 F.3d at 361.  Here, Defendants cannot establish a logical connection between the New Legal Mail Policy and the transmission of contraband they seek to thwart.

A prison regulation does not meet the requirements of the first *Turner* factor "where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational" or where the regulation "represents an exaggerated response to [the asserted] objectives." *Turner*, 482 U.S. at 89–90. Although the Plaintiffs bear the ultimate burden of showing that the New Legal Mail Policy is unconstitutional, it is Defendants' burden to first demonstrate that a valid, rational connection exists between the policy and a legitimate penological interest. *See Fontroy v. Beard*, 559 F.3d 173, 177 (3d Cir. 2009).

In *Bieregu v. Reno,* 59 F.3d 1445 (3d Cir. 1995), the Third Circuit found no valid, rational connection between legal mail and institutional security "on the supposition that correspondence may contain plans for escape or incite violence." *Bieregu,* 59 F.3d at 1457.  While institutional security is a legitimate penological interest, "to suggest that repeatedly opening incoming court mail outside the presence of an inmate advances a legitimate interest in institutional security . . . would overreach." *Id.* The Court later paraphrased this holding: "In other words, while it was true that legal mail conceivably might contain such plans and the opening of it might conceivably thwart those plans, the risk allegedly addressed was too insubstantial to justify incursion on First Amendment rights." *Jones*, 461 F.3d at 361.

Likewise, in *Jones v. Brown*, while acknowledging that the threat of biological toxins entering the prison through the mail (after the events of September 11, 2001 and the anthrax scare in October 2001) could justify a "temporary, emergency measure," the Court found that a continuing policy of opening mail outside of the inmate's presence (without copying and without storing the original) did not have a reasonable causal nexus with the stated interest. *Id.* at 361. "[E]ven if an administrator could reasonably conclude in October of 2004 that there was a non-*de minimus* risk of an anthrax attack on New Jersey prisons, common sense, without more, would not afford a reasonable basis for believing that the risk would be materially reduced by opening letters from lawyers and courts." *Id.* at 363.

In this case, there similarly is no rational connection between the New Legal Mail Policy and the DOC's stated interest. While Plaintiffs recognize that preventing drugs and toxins from entering DOC facilities is a legitimate penological interest, there is no valid, rational connection between this interest and legal mail between incarcerated individuals and their attorneys. The DOC has no reason to believe, and is unable to demonstrate, that legitimate legal mail is responsible for drugs or toxins entering the prisons. The mere possibility that this could occur is, as the Third Circuit has held, "too insubstantial to justify incursion on First Amendment interests." *Jones*, at 361.

PHDATA 6628401_2

The concern, if any, is not with legitimate legal mail, but rather, with non-legal mail disguised as legal mail. As set forth above, on some occasions, DOC employees did not completely cross out or remove attorney control numbers from legal mail prior to handing the correspondence to the incarcerated individual, and therefore, others learned the control number for that attorney. If the DOC legitimately is concerned with the possibility that fake legal mail could introduce drugs or toxins into its facilities, there are numerous ways in which it could improve its attorney control number system. For example,

- The DOC could implement a better way of removing control numbers before providing mail to the incarcerated individuals.

- The DOC could re-issue control numbers periodically.

- The DOC could require separate control numbers for each attorney, rather than a single number for each organization or firm.

- The DOC could issue stickers with control numbers that include barcodes, QR codes or holograms to make them more difficult to compromise.

- The DOC could establish an email verification system that would allow the facility to verify that the attorney whose control number is used truly sent legal mail to that facility on that particular day.

Each of the above at least arguably would have a valid, rational connection to the stated interest of preventing fake legal mail. And none of the above significantly

PHDATA 6628401_2

infringe upon the First Amendment rights of incarcerated individuals and their attorneys.[6]

Instead, Defendants chose to implement a costly and time-consuming process of confiscating and retaining opened, privileged communications, thus exposing these communications to potential disclosure and infringing upon Plaintiffs' First Amendment rights. There is no valid, rational connection between this new policy and the DOC's stated interest, and therefore, the policy fails the first *Turner* factor. For this reason alone, the DOC's policy is unconstitutional and this Court need not consider the remaining *Turner* factors.

    b. <u>There Are No Reasonable Alternative Means for Incarcerated Individuals and Their Attorneys to Exercise Their First Amendment Right to Engage in Confidential Communications</u>

If a prison regulation is found to have a valid, rational connection to the legitimate penological interest put forth by prison officials, the court must then consider the next three *Turner* factors. The second factor concerns the extent of the infringement of constitutional rights, and whether there are alternative means for those exercising those rights. *DeHart*, 227 F.3d at 53.

---

[6] Plaintiffs submit that these proposals also would be an overreach inasmuch as there is no valid, reason to believe that fake legal mail is the source of the alleged toxins at issue. But the impact of such procedures would be far less than the New Legal Mail Policy.

In *Bieregu*, the Third Circuit concluded there was no means "other than by way of uninhibited use of the mail" for incarcerated individuals to have competent and appropriate legal representation. 59 F.3d at 1458. Similarly here, Plaintiffs have no alternative means of exercising their First Amendment rights. There are no other viable avenues for incarcerated individuals and their attorneys to correspond effectively and with the required regularity.

Attorneys cannot physically visit their clients each time there is an important development in the case or each time they need to review a document with their client. Organizational Plaintiffs are non-profit organizations that do not have the resources to travel to DOC facilities with such consistency. Mr. Hayes is represented by public defenders, who have similarly limited resources. Personal visits are especially time-consuming and expensive because incarcerated individuals are housed throughout the Commonwealth at locations unrelated to where they live or were sentenced. Most DOC prisons are far from Pittsburgh or Philadelphia where the main offices of Organizational Plaintiffs are located. Therefore, attorneys often have to travel great distances for such meetings.

Moreover, personal visits also are subject to various restrictions, such as limited visiting days and hours, time limits, restrictions on the number of documents an attorney may bring with him/her, lack of confidential space for privileged discussions, etc. For clients not in general population, the restrictions

PHDATA 6628401_2

are even more severe. In some instances, the only way for an attorney to review a document with a client is to put each page of the document up to a glass partition to have the client review—a process that is unworkable for longer documents.

Legal phone calls—unmonitored calls in a private area with the opportunity for longer conversations—are difficult to schedule at the majority of DOC facilities, completely prohibited without a court order at others, and simply not possible under many circumstances. In the event a client wishes to speak with her attorney without the attorney initiating the call, or when a legal call cannot be scheduled, phone calls from incarcerated individuals are restricted to fifteen minutes on phones in public areas. And of course, a phone call is not a realistic option for reviewing draft pleadings, discovery responses, or obtaining signatures on pleadings or settlement agreements.

Attorneys have a duty to communicate with their clients and a concomitant duty to maintain the attorney-client privilege and to keep those communications confidential. *See, e.g.,* Pennsylvania Rules of Prof'l Conduct, r. 1.4, 1.6(d) (2016). Legal ethics experts have advised the Organizational Plaintiffs that the new procedures do not adequately protect confidentiality, and as a result, Organizational Plaintiffs have had no choice but to personally visit each client or attempt to schedule legal calls. Consequently, Organizational Plaintiffs are suffering harm in the nature of increased costs and time incurred, and their clients,

including Mr. Hayes, are incurring delays in their proceedings. Furthermore, all Plaintiffs are being harmed by the infringement of their First Amendment rights and the adverse impact on their attorney-client relationships.

These reasons demonstrate what the Third Circuit has held: communication by mail is a critical component of the incarcerated individual's ability to have competent and appropriate legal representation and of the ability of the attorney to provide it. There is no viable alternative. *Bieregu*, 59 F.3d at 1458.

c.   <u>Allowing Attorneys to Communicate Confidentially with Their Incarcerated Clients Would Not Have an Adverse Impact on the DOC's Stated Interests</u>

The third *Turner* factor takes into account the impact that accommodation of Plaintiffs' constitutional rights would have on prison personnel, other incarcerated individuals, and the allocation of prison resources.  *Turner*, 482 U.S. at 90–91. To undertake this analysis, courts must consider whether there are practical options available to the DOC that, if implemented, would allow the Plaintiffs to exercise their rights without causing unreasonable difficulties for the prison. *Id* This factor also requires courts to consider whether an accommodation would cause a "significant reallocation of the prison system's financial resources and would impair the ability of corrections officers to protect all who are inside a prison's walls." *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003).

As the Third Circuit previously held, "[t]o accommodate plaintiff's rights to free speech and court access by opening his incoming court mail only in his presence places no burden at all on guards, prisoners, and the allocation of prison resources; it is what the regulations have required since 1985." *Bieregu*, 59 F.3d at 1458 (*citing* the Bureau of Prisons regulations at 28 C.F.R. §540.18 (1994). So too here. Whatever inspection is necessary and appropriate can be done in the presence of the recipient of the legal mail, without making copies and without retaining the original legal mail outside the recipient's presence. In fact, such a procedure is less time-consuming and less costly than the new policy. There would be no costs for purchasing and maintaining copiers, no costs for contracting for the storage and destruction of original legal mail, and correctional officers would have more time to devote to other duties.

As discussed above, to the extent the DOC legitimately is concerned with fake legal mail, there are numerous methods by which the DOC can improve its attorney control number system to address that concern. Therefore, there are multiple ways in which Plaintiffs' constitutional rights can be accommodated without adversely impacting DOC staff, other incarcerated individuals, or the allocation of prison resources.

        d.       <u>Available Alternatives Exist that Would Be Less Intrusive to Plaintiffs' Right to Engage in Confidential Attorney-Client Communications</u>

The final factor under *Turner* analyzes whether there are alternative means for prison officials to address legitimate penological concerns without infringing on inmates' constitutional rights. *Turner*, 482 U.S. at 90–91. In *Turner*, the Supreme Court stated that "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Id. See also Williams v. Bitner*, 359 F. Supp. 2d 370 (M.D. Pa. 2005), *aff'd in part, remanded in part*, 455 F.3d 186 (3d Cir. 2006) (finding obvious alternatives to forcing an incarcerated Muslim employee to prepare pork, such as dismissing him from that particular job; such an alternative would have protected his religious rights and constituted a *de minimis* cost to the prison).

Again, the prior legal mail policy was a less intrusive means of preventing contraband from entering the prison through privileged legal correspondence. The DOC has no reason to believe, and cannot point to any evidence, that this prior method was ineffective. Although DOC believes that <u>non</u>-legal mail is a potential source of drugs or toxins, there is no basis for believing that mail from attorneys introduced drugs or toxins into DOC facilities. To the extent the DOC believes that fake legal mail could be a potential source, there are numerous alternatives by which that concern can be addressed, as described in more detail, *supra*.

All four *Turner* factors support the conclusion that the New Legal Mail Policy is not reasonably related to the DOC's stated interest. The Policy infringes

upon Plaintiffs' rights by intercepting and retaining Plaintiffs' privileged communications and by placing the confidentiality of those communications at risk. Organizational Plaintiffs have been forced to abandon use of the mail for any privileged communications with their clients, and their clients and Mr. Hayes have had their attorney relationships compromised, which inhibits various rights including their First Amendment rights as described above. At a minimum, Plaintiffs have established a *prima facie* case of a constitutional violation, and therefore, the first factor of the preliminary injunction test is satisfied.

### B.   <u>The New Legal Mail Policy Causes Irreparable Injury to Plaintiffs' First Amendment Rights</u>

Plaintiffs are being harmed in a number of ways as a result of the New Legal Mail Policy. First and foremost, the Policy chills Plaintiffs' constitutional rights to have uninhibited communications between attorney and client. This infringement on Plaintiffs' First Amendment Rights is by definition causing Plaintiffs irreparable harm. *Abu-Jamal v. Price*, 154 F.3d 128, 136 (3d Cir. 1998) (reading and copying legal mail constituted irreparable harm supporting a preliminary injunction). S*ee also, Council of Alt. Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997) (where plaintiffs are likely to prevail on merits on violation of constitutional rights (here voting and association) "it clearly follows that denying them preliminary injunctive relief will cause them to be irreparably injured"); *Beattie v. Line Mountain Sch. Dist.*, 992 F. Supp. 2d 384, 396 (M.D. Pa. 2014)

PHDATA 6628401_2

("Deprivation of a constitutional right alone constitutes irreparable harm as a matter of law, and no further showing of irreparable harm is necessary"); *Musser's Inc. v. U.S.*, No. 10-4355, 2011 WL 4467784, at *8 (E.D. Pa. Sept. 26, 2011) (noting that "[d]eprivation of a constitutional right has been recognized [by the Third Circuit] as irreparable harm").

Due to the risk of interception or disclosure, Plaintiffs can no longer communicate by mail. Instead, Organizational Plaintiffs and the attorneys for Mr. Hayes have been forced to travel throughout the Commonwealth to meet with their clients personally each time they need to discuss a document. As discussed above, this places a heavy burden on the Organizational Plaintiffs, non-profit organizations with limited staff and resources, as well as counsel for Mr. Hayes, a federal public defender with similarly limited resources. In addition, there are many restrictions on in-person visits that make written communications an indispensable part of the attorney-client relationship. Therefore, even if the attorneys had sufficient resources, in-person visits would not be an adequate substitute for all mail communications.

Organizational Plaintiffs have incurred extra costs in making personal visits rather than using the mail. Further, Plaintiffs are aware of several instances where incarcerated individuals were forced to move for stays or enlargement of time due to the inability to schedule in-person visits in time to comply with court deadlines.

Therefore, even though actual injury need not be shown,[7] this policy already is having a definable impact on underlying cases.

**C.    Defendants Would Not Be Harmed by the Issuance of an Injunction and the Public Interest Supports an Injunction Here**

Given the plain violation of Plaintiffs' First Amendment rights and the attendant irreparable harm, the remaining preliminary injunction factors similarly favor the Plaintiffs. In contrast to the momentous restriction on Plaintiffs' ability to engage in protected privileged communications between attorneys and clients, Defendants cannot demonstrate that any meaningful, cognizable harm will occur to them from an injunction. The DOC has no reason to believe, and no evidence to support the theory, that legitimate legal mail has any connection with the alleged drugs or toxins that gave rise to the lockdown and subsequent change in policies. For this reason alone, Defendants would not suffer any harm if the requested injunction were granted.

As set forth above, to the extent the DOC legitimately believes that fake legal mail creates an issue, there are numerous ways the DOC can address that

---

[7]     *See Jones*, 461 F.3d at 360, 365 (granting injunctive relief and holding that actual injury need not be shown in First Amendment legal mail case because "protection of an inmate's freedom to engage in protected communications is a constitutional end in itself."); *Al-Amin v. Smith,* 511 F.3d 1317, 1323, 1335 (11th Cir. 2008) (holding that "actual injury is not a constitutional prerequisite to a free speech claim" in suit seeking permanent injunction).

specific problem. There is no basis for Defendants to argue that they would suffer any harm from the requested injunction.

Finally, the public interest strongly favors granting Plaintiffs' motion. "In the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights." *Hooks*, 121 F.3d at 884. *See also, Tenafly Eruv Ass'n, Inc.*, 309 F.3d at 178 (quoting same).  It is in the public interest that the government not be permitted to interfere with confidential attorney-client communications. "[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates…Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84.

The "cornerstone" of the attorney-client relationship is confidentiality. Gregory C. Sisk, *Legal Ethics and the Practice of Law 4-6.1*, LEGAL ETHICS, PROF. RESP., & THE LEGAL PROF., 2018, at 305.  Confidentiality is necessary to build a trusting relationship between attorney and client, and to help ensure the attorney obtains all information necessary to represent appropriately the client's interests. Indeed, lawyers have an ethical duty to ensure that communications with a client are confidential. Pennsylvania Rules of Prof'l Conduct, r. 1.6(c) (2016).  A policy that intrudes upon the attorney-client privilege and the confidential nature of those communications makes it impossible for an attorney to comply with her

obligations, interferes with the client's right of free speech and access to the courts, and disrupts the entire legal process. There is a strong public interest in protecting the attorney-client privilege and the confidentiality of attorney-client communications. *See Klitzman, Klitzman and Gallagher v. Krut*, 744 F.2d 955, 960 (3d Cir. 1984) ("Documents within the scope of the attorney-client privilege are 'zealously protected' . . . the attorney-client privilege is so sacred and so compellingly important . . . the canons of ethics make the attorney's common law obligation to maintain the secrecy of his communications with his client a professional mandate.") (internal citations omitted); *Martin v. Lauer*, 686 F.2d 24, 32–33 (D.C. Cir. 1982) ("Through the attorney-client privilege, the common law 'encourage(s) full and frank discussions between attorneys and their clients and thereby promote(s) broader public interests in the observance of law and the administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends on the lawyer being fully informed by the client.'").

Similarly, there is a strong public interest in protecting First Amendment rights. *Denius v. Dunlap*, 209 F.3d 944, 954 (7th Cir. 2000) ("If by compelling an individual to reveal information that he would rather keep confidential the state chills the individual's ability to engage in protected speech, the state has infringed the individual's First Amendment right in the protected speech . . . .,") (citing

*McIntyre v. Ohio Elections Comm.*, 514 U.S. 334, 341–42 (1994); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462–63 (1958)). *See also Am. Civil Liberties Union Fund of Mi. v. Livingston County*, 23 F. Supp. 3d 834 (E.D. Mich. 2014), *aff'd* 796 F.3d 636 (6th Cir. 2015), *cert. denied* 136 S. Ct. 1246 (public interest supported injunction of policy of refusing to promptly deliver properly marked legal mail sent by attorney for civil rights organization and individually addressed to inmates).

No contrary public interest is served in allowing Defendants to enforce the New Legal Mail Policy, where there is no valid, rational connection between that policy and the interest purportedly being served. For the same reasons that the New Legal Mail Policy fails the test set forth in *Turner*, the public interest compels an injunction prohibiting enforcement of that policy.

## V.   CONCLUSION

For the reasons described above, Defendants should be enjoined from enforcing the New Legal Mail Policy and violating the Plaintiffs' constitutionally protected right to free speech.

Respectfully submitted,

*/s/ Keith E. Whitson*
Keith E. Whitson
Pa. I.D. No. 69656 (admission pending)
*/s/ Stephanie A. Short*
Stephanie A. Short
Pa. I.D. No. 324023 (admission pending)
*/s/ Danielle T. Bruno*
Danielle T. Bruno
Pa. I.D. No. 324539 (admission pending)
*/s/ Paul H. Titus*
Paul H. Titus
Pa. I.D. No. 1399 (admission pending)
**SCHNADER HARRISON SEGAL &
LEWIS LLP**
2700 Fifth Avenue Place
120 Fifth Avenue
Pittsburgh, PA 15222
Telephone: (412) 577-5220
Facsimile: (412) 577-5190
kwhitson@schnader.com
sshort@schnader.com
dbruno@schnader.com
ptitus@schnader.com

*/s/ Alexandra Morgan-Kurtz*
Alexandra Morgan-Kurtz, Esq.
PA ID No. 312631
*/s/ Angus Love*
Angus Love, Esq.
PA ID No. 22392
**Pennsylvania Institutional Law Project**
100 Fifth Ave, Ste. 900
Pittsburgh, Pa 15222
Tel: (412) 434-6175
amorgan-kurtz@pailp.org

The Cast Iron Building
718 Arch Street, Suite 304 South
Philadelphia, PA 19106
alove@pailp.org

*/s/ Bret Grote*
Bret D. Grote, Esq.
PA ID No. 317273
*/s/ Quinn Cozzens*
Quinn Cozzens, Esq.
PA ID No. 323353
**Abolitionist Law Center**
P.O. Box 8654
Pittsburgh, PA 15221
Tel: (412) 654-9070
bretgrote@abolitionistlawcenter.org
qcozzens@alcenter.org

*/s/ Ashley Henderson*
Ashley Henderson (*pro hac vice* pending)
PA I.D. No. 313492
*/s/ Deneekie Grant*
Deneekie Grant (*pro hac vice* pending)
PA I.D. No. 314220
**Amistad Law Project**
P.O. Box 9148
Philadelphia, PA 19139
Tel: (267) 225-5884
ashley@amistadlaw.org
nikki@amistadlaw.org

*/s/ Sara J. Rose*
Sara J. Rose, Esq.
PA ID No.: 204936
*/s/ Witold J. Walczak*
Witold J. Walczak, Esq.
PA ID No.: 62976
**American Civil Liberties Union of
Pennsylvania**

36                                        PHDATA 6628401_2

247 Fort Pitt Blvd.
Pittsburgh, PA 15222
Tel: (412) 681-7864 (tel.)
Fax: (412) 681-8707
srose@aclupa.org
vwalczak@aclupa.org

*Attorneys for Plaintiffs*

Dated: November 1, 2018